## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEFFREY NORTH                         :
1602 Upland Street                    :
Chester, PA 19013,                    :
           Plaintiff      :          CIVIL ACTION
                      :
      v.                      :          NO.:
                      :
WIDENER UNIVERSITY                    :
One University Place                  :
Chester, PA 19013-5792,               :          JURY TRIAL DEMANDED
           Defendant       :
_____     :

## COMPLAINT

Plaintiff, Jeffrey North, by and through his undersigned counsel, hereby alleges as follows:

## PARTIES

1.    Plaintiff is an adult individual residing at the above-captioned address.  At all times material hereto, Plaintiff was a student at Widener University ("Widener" or "Defendant").

2.    Defendant is a private university with administrative offices at the above-captioned address.  At all times relevant hereto, Widener was a recipient of federal financial assistance.

## JURISDICTION AND VENUE

3.    Plaintiff brings this action for disability discrimination under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §794 ("Section 504").

4.    This Honorable Court has jurisdiction over this matter pursuant to the above statutes as well as 28 U.S.C. §§1331 and 1343. The court also has supplemental jurisdiction over

1

Plaintiff's pendent state law claim for breach of contract pursuant to 28 U.S.C. §1367(a).

5.     Venue is appropriate in this Court since the claims described herein arose in this Judicial District.  Also, Plaintiff and Defendant reside in this Judicial District.

## ALLEGATIONS OF FACT

6.     Plaintiff is an intelligent young man who enrolled in Ithaca College in the Fall of 2002 in pursuit of a joint degree in Anthropology and Psychology.  In the Spring of 2005, Plaintiff applied for and was accepted as a summer intern to the Widener Neuropsychological Assessment Center chaired by Dr. Mary Lazar and Dr. Kenneth Goldberg.

7.     During this summer of 2005, Plaintiff resided at the home of Dr. Robert Gillespie, an adjunct professor at the Widener University Graduate Psychology Program.  Plaintiff then graduated from Ithaca College in the Spring of 2006 with joint degrees degree in Anthropology and Psychology.

8.     In August, 2006, Plaintiff applied for admittance to and was accepted in Defendant's Doctorate of Psychology ("Psy.D.") program ("the Program").  Defendant admitted Plaintiff into the Program with full and complete knowledge that he suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), although he did not seek any accommodation for such disability at that time.

9.     Defendant assigned Kenneth Goldberg, Psy.D. to serve as Plaintiff's faculty advisor.  As such, according to its Institute for Graduate Clinical Psychology Manual (the "Psy.D. Manual"), Dr. Goldberg was required to:

> ". . .work with [Plaintiff] on an ongoing basis to review [his] academic and field placement performance and to address any questions and concerns [he] may have either about his own performance or about the program in general. (Psy.D. Manual, p.

8).

10.     The Psy.D. Manual went on to specify that, in the event Plaintiff encountered difficulties, Dr. Goldberg must:

> ". . . work collaboratively with [him], the Program director, and possibly the directors of the practicum or internship training to formulate possible solutions." *Id.*

11.     Given his ADHD, Plaintiff struggled during his first year in the Program. In February, 2007, he received a final grade of "C" in Introduction to Psychodynamic Theory, taught by adjunct associate professor Dr. Barbara Goldsmith.  Program officials recommended he retake the class.  In addition, this grade reduced Plaintiff's overall GPA to 2.9.   As a result, Widener placed Plaintiff on academic probation.

12.     Plaintiff also struggled behaviorally with his ADHD. On or about May 21, 2007, Dr. Goldsmith submitted to her superiors a blue book containing some of Jeff's drawings. She complained that these drawings underscored Jeff's "strange behavior" in the Program.

13.     On or about November 19, 2007, Defendant's faculty reviewed Plaintiff's progress. By letter dated December 6, 2007, Program director Virginia Brabender, Ph.D. advised Plaintiff that he had improved sufficiently that he was no longer on academic probation. She directed Plaintiff to schedule periodic meetings with Dr. Goldberg and her to review his progress.

14.     Unfortunately, Plaintiff's difficulties in managing his ADHD in the Program persisted.  On or about February 11, 2008, Plaintiff was placed by his mandatory off-site practicum on 30-days probation. The practicum administration also required him to undertake more client interventions.  Defendant instructed Plaintiff to comply with the terms of the

3

probation.  Plaintiff successfully completed his 30 day probation and returned to good standing without further incident.

15.     Following the suggestions of the Dr. Brabender and his advisor, Dr. Goldberg, Plaintiff applied for a leave of absence beginning with the fall semester, 2008.  By letter dated March 18, 2008, Dr. Brabender approved Plaintiff's request.  Plaintiff put his time away from Widener to good use, becoming a nationally registered EMT –Basic and working as an ambulance driver/ attendant.

16.     In August, 2009, at the start of his third year, Widener reinstated Plaintiff into the Program in good standing. It still did not offer him any services for his ADHD.

17.     As with all third year students, Plaintiff underwent a faculty review during the fall of 2009.  Unnamed faculty members claimed Plaintiff struggled in certain unspecified ways during his mandatory, off-site practicum. However, in an evaluation report, Dr. Estelle, Plaintiff's practicum supervisor, awarded him high marks in the vital areas of collaboration and willingness to learn.

18.     In March, 2010, Widener again placed Plaintiff on probation.  The true reason for this action was the faculty's vague displeasure with Plaintiff's supposedly unusual behavior stemming from his ADHD.

19.     In May, 2010, Plaintiff and a group of students were studying in a classroom when a faculty member asked them to leave. A misunderstanding ensued, to the annoyance of the faculty member.  Plaintiff promptly apologized to the faculty member for any affront he may have caused.

20.     By letter dated May 21, 2010, Dr. Brabender directed Plaintiff to schedule a

meeting with Dr. Gibbings, his new advisor, and her to discuss the above incident.  Since Dr. Brabender sent the letter to a location other than Plaintiff's official school address, he did not receive it.

21.     At the end of the Spring 2010 semester, Plaintiff registered for his classes for the Fall 2010 semester.  At the beginning of the Fall 2010 semester, Defendant ultimately accepted Plaintiff's registration and took his tuition money.

22.     In June, 2010, Plaintiff took his third year qualifying exam and passed six of the seven sections. Unfortunately, he failed the research method portion of the exam, which was given by a professor who had never taught Plaintiff.  Despite this shortcoming, in July, 2010, Widener permitted Plaintiff to begin his fourth year in the Program in good standing.

23.     In July, 2010, Plaintiff began a mandatory internship. Also that month, as required, Plaintiff forwarded an outline of his proposed dissertation to the Widener faculty.

24.     At the start of the fall, 2010 semester, Plaintiff discovered Widener deleted his class registration from its computer system.  Widener also blocked Plaintiff from registering for any classes. Eventually, Widener allowed Plaintiff to register for classes.

25.     Widener scheduled Plaintiff to retake the research methods section of his qualifying examination on Saturday, October 23, 2010. Unfortunately, on October 18, 2010, Plaintiff's beloved grandfather suddenly passed away.  Plaintiff's family scheduled the memorial service for October 23, 2010.

26.     Plaintiff promptly requested Widener postpone the exam.  Widener refused until Plaintiff presented written proof that his grandfather actually died.  Even then, Widener only agreed to reschedule Plaintiff's exam until Tuesday, October 26, 2010 and Thursday, October

5

28, 2010.

27.    Despite the emotional trauma of his grandfather's death, Plaintiff passed the second half of the research methods test and came within one point of passing the first portion. Regardless, by letter dated November 2, 2010, Dr. Wilhite advised Plaintiff that he failed the exam.

28.    Dr. Wilhite then declared Plaintiff ineligible for "official candidacy" for a Psy.D. degree. He warned Plaintiff that "the conditions for [his] continuing in the program will be reviewed by the faculty in the coming weeks." Dr. Wilhite did not notify Plaintiff of the date and time of this meeting or afford him the opportunity to be heard at it.

29.    Also on or about November 2, 2010, Dr. Goldberg sent Plaintiff an email not from his official Widener account but from an unknown email address he never used before in communicating with Plaintiff. He purported to order Plaintiff to send him additional information about his status in the Program. He then directed Plaintiff to ask him in writing for leave to continue in the Program by Friday, November 5, 2010. Dr. Goldberg cited no basis in Widener's numerous, often contradictory, policy publications for this novel request.

30.    Dr. Goldberg did not send this important message via U.S. mail, Federal Express or other accepted mode of official communication. He did not telephone Plaintiff, request confirmation of email delivery from the internet service provider or take any reasonable steps whatsoever to ensure Plaintiff received the message in a timely manner. Since it did not recognize the sender's email address, Plaintiff's email system treated the message as junk mail. As a result, Plaintiff did not read it until Monday, November 8, 2010.

31.    On November 8, 2010, without notice to Plaintiff or an opportunity for him

to be heard, Defendant expelled Plaintiff from the Program. Dr. Wilhite advised Plaintiff of this decision in a terse, seven-line letter dated the same day. In it, he vaguely referred to Plaintiff's subpar score on the research section of the qualifying exam. Dr. Wilhite then cited Plaintiff's failure to ask Dr. Goldberg to remain in the Program and his "previous history of problematic behavior." The latter comment demonstrates Defendant's frustration in dealing with Plaintiff's difficulties stemming from his ADHD. The letter stated that, should he wish to appeal this decision, Plaintiff should refer to the PsyD Student Manual.

32.     By letter dated November 10, 2010, Plaintiff sent Defendant's faculty a comprehensive plan for his completing the Program. He emphasized his struggles with ADHD in the Program. He explained how his grandfather's death contributed to his narrow failure on the qualifying exam. He poignantly explained how he devoted eight years of his life (including four years in the Program) to becoming a psychologist. He reminded the faculty that he fell only one point shy of passing the qualifying exam. He pointed out that approximately five of his peers also failed to pass the qualifying exam but that Widener allowed them to continue in the Program.

33.     Plaintiff respectfully asked leave to remain in the Program. He proposed retaking the research methods class. He promised to enter therapy to manage his ADHD and then remain under the supervision of a licensed psychiatrist. He offered to extend his stay in the Program so he could appropriately grieve his grandfather's death.

34.     By letter dated November 19, 2010, Plaintiff appealed his termination from the Program. He explained his innocent failure to read Dr. Goldberg's email. In reliance on the Psy.D. Student Manual, he then demanded Defendant offer him a chance at remediation before it

terminated his enrollment.

35.     Plaintiff again stressed that Defendant allowed approximately five (20%) of non-disabled Program students to take the qualifying exam a third time following a similar failure. He questioned Widener's discriminatory motives in permitting those students to remain in the Program.

36.     Plaintiff reminded the faculty that his "problematic" behavior stemmed from his ADHD. He assured them he was successfully remediating this condition.  He pointed out that his practicum supervisor, Dr. Estelle, termed Widener's criticism of his professional difficulties "overblown."

37.     On November 22, 2010, Defendant's faculty met in secret to reject Plaintiff's appeal. By letter dated December 7, 2010, Dr. Wilhite advised Plaintiff of this decision.

38.     By letter dated December 10, 2010, plaintiff, through counsel, appealed both Widener's refusal to allow him to retake his qualifying exam and its termination of Plaintiff from the Program. A copy of this appeal is attached as Exhibit "A". Plaintiff asserted Defendant's termination constituted illegal disability discrimination under both the ADA and Section 504.

39.     In addition to the above, Plaintiff pointed out that Defendant allowed the approximately five non-disabled Program students who failed the re-take exam to submit remediation plans and remain in the Program while denying Plaintiff this right.

40.     Plaintiff also averred that Defendant's reliance on his failure to submit a formal request for continuation in the Program within an arbitrary, short time frame, based on an email sent from an unknown address, was an attempt to cover its disability discrimination.

41.     Further, Plaintiff asserted Defendant terminated him from the Program without

8

following the procedures in the Psy.D. Student Manual. Specifically, Defendant denied him proper notice and an opportunity to respond before expelling him from the Program.

42.     Plaintiff then contended Defendant violated his rights under Section 504 by not considering available, less harsh remedies besides termination. In particular, under Program guidelines, Defendant may offer underperforming students the chance to repeat their internship placement during a fourth year. He contended Defendant chose not to consider this reasonable, humane approach based on disability discrimination.

43.     Plaintiff then asserted Defendant's reference to his alleged "problematic behavior" was code for discrimination based on his ADHD. Based on Dr. Estelle's comments, he claimed his behavior was not significantly "problematic" at all.

44.     Plaintiff also appealed Defendant's miscalculation of his qualifying exam score. He observed Defendant capriciously deducted one point for "incorrect clause structure," at worst an insignificant grammar error. Defendant also deducted a point from an otherwise correct answer based on Plaintiff's supposedly improper use of the word "but." If Defendant had not made these and other grading errors, Plaintiff would have passed the test.

45.     By letter dated December 10, 2010, Dr. Wilhite notified Plaintiff that Defendant's "Academic Council" would consider his appeal on December 16, 2010. By letter dated December 13, 2010, Defendant demanded Plaintiff resubmit his appeal without the assistance of counsel.

46.     By letter dated December 14, 2010, Plaintiff requested Defendant set forth the basis for his termination. He also demanded the right to attend the meeting with his attorney. He further asked permission to question his accusers, particularly Dr. Goldberg. By letter dated

9

December 15, 2010, Defendant rejected Plaintiff's requests.

47. On December 16, 2010, Plaintiff attended the meeting alone. Defendant again rejected Plaintiff's requests for counsel, to confront his accusers and other basic tenets of due process. By letter dated December 20, 2010, Defendant rejected his appeal. The terse, three-paragraph document gave no reason for this decision.

48. Plaintiff appealed his termination to the "Academic Review Board", which met in secret on January 18, 2011 to discuss the matter. In a two-paragraph note, Defendant rejected Plaintiff's appeal. It noted "there are no further appeals of this decision."

49. Plaintiff then filed a complaint with the U.S. Department of Education, Office of Civil Rights ("OCR"). (Exhibit "A" hereto). By decision dated July 25, 2011, OCR rejected Plaintiff's complaint. (Exhibit "B" hereto.) Without explanation, OCR rejected Plaintiff's claim that he repeatedly disclosed his ADHD to Defendant's officials. OCR ignored Plaintiff's claim that Defendant obviously regarded him as "an individual with a disability" within the meaning of Section 504.

50. Further, OCR disregarded Plaintiff's claim that, by terminating him based on a ". . . history of problematic behavior," Defendant admitted Plaintiff's disability caused his termination. OCR faulted Plaintiff for not providing it with medical documentation of his ADHD. OCR never meaningfully addressed Plaintiff's claim that Defendant terminated him from the Program, mis-graded his qualifying exam and otherwise discriminated against him in order to remove him from the Program based on his disability. OCR's decision violates Plaintiff's civil rights in many other respects as well.

## COUNT I
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

51.     Plaintiff incorporates the averments in the preceding paragraphs by this reference as if same were fully set forth herein.

52.     Section 504 provides, in pertinent part:

> "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .."

53.     Plaintiff is "an individual with a disability" by virtue of his ADHD.

54.     Plaintiff's ADHD substantially limits his "major life activity" of learning.

55.     Plaintiff informed Dr. Gillespie, Dr. Goldberg and other Widener professors and administrators that he suffered from ADHD.   Accordingly, Defendant was well aware that Plaintiff was an "individual with a disability" under Section 504.

56.      Defendant regarded Plaintiff as an "individual with a disability" as shown by its fixation with Plaintiff's drawings and its dismissal of Plaintiff from the Program for "problematic behavior."

57.     Defendant discriminated against Plaintiff based on his disability by:

A.     Allowing numerous non-disabled Psy.D. students to retake the October, 2010 qualifying exam while denying Plaintiff the same opportunity;

B.     Terminating Plaintiff from the Program even though he failed the qualifying exam by just one point and passed the assessments and diagnosis section of the test;

C.     Sending Plaintiff an email demanding he submit a formal request to

11

continue in the Program, from an unknown email address, and offering Plaintiff just a few short hours to respond.  Conversely, the advisors of Plaintiff's similarly situated, non-disabled peers directly contacted them to insure they provided written responses to the faculty at the November 8, 2010 conference;

        D.     Terminating Plaintiff from the Program without following the procedures set forth in the Psy.D. Student Manual and other pertinent manuals, while affording his similarly-situated, non-disabled peers additional procedural rights;

        E.     Failing to consider less harsh remedies than termination when such remedies were offered to similarly-situated, non-disabled students;

        F.     Failing to offer Plaintiff the opportunity to pursue to a remediation plan, even though it offered similarly-situated, non-disabled students this chance.

    58.    As a direct, proximate and reasonably foreseeable result of the above, Plaintiff suffered the damages described below.

## COUNT II - BREACH OF CONTRACT

    59.    Plaintiff incorporates the averments in the preceding paragraphs by this reference as if same were fully set forth herein.

    60.    The relationship between a student and a post-secondary institution such as Defendant is contractual. *Ross v. Pennsylvania State University*, 445 F.Supp. 147, 152 (M.D. Pa. 1978); *Strank v. Mercy Hospital of Johnstown*, 383 Pa. 54, 117 A.2d 697 (1955).

    61.    At all times material hereto, a contract existed between Widener and Plaintiff. Based on this contract, Plaintiff had a reasonable expectation that, if he performed the required work in a satisfactory manner and paid his tuition and fees, Defendant would award him the

Psy.D. degree he sought.

62.     In fulfillment of this contract, Plaintiff, *inter alia*:

A.     Attended the Program from the fall of 2006 until approximately December, 2010;

B.     Paid all Defendant's required tuition and fees;

C.     Performed all his schoolwork in a satisfactory manner;

D.     Compiled sufficient credits and adequate grades to remain on course to graduate with a Psy.D. degree.

63.     Defendant materially breached its contract with Plaintiff by:

A.     Terminating his enrollment in the Program based on his disability as set forth in Count I above;

B.     Terminating Plaintiff from the Program by letter dated December 7, 2010 without specifying what Program rules Plaintiff broke and how he broke them;

C.     Terminating Plaintiff from the Program for not submitting a formal request to continue in the Program, an absurd and unreasonable request that finds no basis in the Program rules;

D.     Sending this ultimatum to Plaintiff in a manner not reasonably calculated to reach him promptly (if at all), and then demanding Plaintiff respond within an unreasonably short time;

E.     Terminating Plaintiff from the Program without following the procedures set forth in the Psy.D. Student Manual;

F.     Terminating Plaintiff from the Program without giving him a full and fair

13

opportunity to utilize legal counsel, submit evidence, present witnesses, cross-examine his accusers or meaningfully speak in his own defense;

G.      Terminating Plaintiff from the Program without considering the less harsh remedies set forth in the Guidelines for Third Year Qualifying Examination, including repeating the internship placement and retaking the qualifying exam;

H.      Denying Plaintiff at least a Master's Degree in Psychology for his efforts and accomplishments in the Program;

I.      Exaggerating Plaintiff's "problematic behavior[s] in the program" when Dr. Estelle, Plaintiff's site supervisor, noted no such "behaviors" and gave him high marks in his internship;

J.      Terminating Plaintiff from the Program without offering him a remediation plan as set forth in the Psy.D. Student Manual;

K.      Terminating Plaintiff from the Program for not passing the qualifying exam, even though Defendant committed numerous grading errors on same.

64.      As a direct, proximate and reasonably foreseeable result of the above, Plaintiff suffered damages described below.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays the Court grant the following relief:

A.      Injunctive relief in the form of an order directing Defendant to reinstate Plaintiff in good standing in the Program;

B.      Injunctive relief in the form of an order directing Defendant to allow Plaintiff to retake the class in question and then retake the portion of the qualifying exam he failed

to pass;

    C.    Damages for disability discrimination in excess of $150,000;

    D.    Alternatively, award Plaintiff monetary damages for breach of contract in

excess of $150,000, representing the cost of four years of tuition and related expenses;

    E.    Reasonable costs and attorney's fees incurred in bringing this matter;

    F.    Statutory interest on the breach of contract claim, as allowed by law; and

    G.    Such further relief as may be just and proper under the circumstances.

Dated:   9/22/11                      **LAW OFFICE OF MARK W. VOIGT**

By:    **MARK W. VOIGT, ESQUIRE**
       Validation of Signature Code #MWV6003
       Plymouth Meeting Executive Campus
       600 West Germantown Pike, Suite 400
       Plymouth Meeting, PA 19462
       (610) 940-1709
       (Attorney for Plaintiff)