IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY NORTH,<br>        Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| WIDENER UNIVERSITY, | : | NO. 11-6006 |
|         Defendant. | : | |
| | : | |
| | : | |
| | : | |

MEMORANDUM OPINION

**Tucker, J.**                                                                                                          **April ____, 2012**

      Presently before this Court is Defendant Widener University's ("Widener" or "Defendant") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 3) and Plaintiff Jeffrey North's ("Plaintiff" or "North") Response in opposition thereto (Doc. 6.) This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a). Venue is proper under 28 U.S.C. § 1391(a)(1) and (2). Upon consideration of the parties' motions with briefs and exhibits,[1] this Court will deny Defendant's Motion to Dismiss.

**I.  FACTS**

      This case arises from Plaintiff's expulsion from the Doctorate of Psychology ("Psy.D.") program (the "Program") at Widener. Plaintiff submits that he suffers from Attention Deficit

---

[1] On a motion to dismiss, a district court may consider documents "'*integral to or explicitly relied upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment.'" In re Burlington Coat Factory Sec. Litig., 114 F. 3d 1410, 1426 (3d Cir. 1997) (citation omitted) (second alteration in original). Plaintiff has submitted documents that he explicitly relies on and are integral to his breach of contract theory. Accordingly, the Court will consider these documents on this Motion.

Hyperactivity Disorder ("ADHD") and that his expulsion was a result of discrimination based on this condition. The relevant facts giving rise to his expulsion are as follows.

During the Summer of 2005, Plaintiff resided at the home of a close family friend, Dr. Robert Gillespie, an adjunct professor in the Program. (Doc. 1, ¶ 7; Doc. 4 at 1.) In August 2006, Plaintiff applied to the Program and was accepted. (Doc. 1, ¶ 8.) He submits that Dr. Gillespie has been aware of his ADHD for many years, but told him not to disclose it to the faculty because it would be regarded as a "sign of weakness and unsuitability for the program." (Doc. 1, ¶ 8; Doc. 4 at 2.) Once enrolled in the Program, Plaintiff was assigned Dr. Kenneth Goldberg to serve as his faculty advisor. (Doc. 1, ¶ 9.)

Plaintiff struggled during his first year, earning a grade point average of 2.9, resulting in academic probation. (Doc. 1, ¶ 11.) Plaintiff also struggled behaviorally. On or about May 21, 2007, his professor, Dr. Barbara Goldsmith, submitted to her superiors a book containing some of Plaintiff's drawings, complaining that these drawings represented Plaintiff's "strange behavior" in the Program. (Doc. 1, ¶ 12.) After a series of probations and subsequent returns to good academic standing, Plaintiff took a leave of absence in 2008. (Doc. 1, ¶¶ 13-15.) Plaintiff returned in good standing to begin his third year in 2009. (Doc. 1, ¶ 16.)

Further academic and behavioral difficulties arose in his third year. In March 2010, Plaintiff was again placed on academic probation. (Doc. 1, ¶ 18.) Plaintiff alleges that the reason was "the faculty's vague displeasure with his supposedly unusual behavior stemming from his ADHD." (Doc. 1, ¶ 18.) One such instance occurred in May 2010, when Plaintiff and a group of students were studying in a classroom when a faculty member asked them to leave. A misunderstanding ensued, "causing a rift" with the faculty member. (Doc. 1, ¶ 19.) In June

2010, Plaintiff took his third-year qualifying exam and passed six of the seven sections. (Doc. 1, ¶ 22.) Widener scheduled Plaintiff to retake his deficient section on October 23, 2010. (Doc. 1, ¶ 25.) On October 18, 2010, Plaintiff's grandfather passed away and the memorial service was held on October 23, 2010. (Doc. 1, ¶ 25.) Widener refused to reschedule Plaintiff's exam until Plaintiff presented written proof that his grandfather had actually died; only then did Widener agree to reschedule the exam for October 26, 2010 and October 28, 2010. (Doc. 1, ¶ 26.) Plaintiff passed half of the exam, but failed the other half by one point. (Doc. 1, ¶ 27.) Plaintiff had one point deducted for "incorrect clause structure" and another for improper use of the word "but." (Doc. 1, ¶ 44.)

On November 2, 2010, Dr. Goldberg sent Plaintiff an email, not from his official Widener email, but from an unknown email address he never used before in communicating with Plaintiff. (Doc. 1, ¶ 29.) In it, he requested that Plaintiff ask him in writing for leave to continue in the Program by November 5, 2010. (Doc. 1, ¶ 29.) Because Plaintiff's email system did not recognize Dr. Goldberg's email address, the system automatically placed the email in his "junk mail" folder and Plaintiff did not read it until Monday, November 8, 2010. (Doc. 1, ¶ 30.) That same day, Defendant expelled Plaintiff from the Program, citing his failing score, his failure to ask Dr. Goldberg to remain in the Program, and his "previous history of problematic behavior." (Doc. 1, ¶ 31.)

On November 8, 2010, Plaintiff wrote a letter asking to remain in the Program. (Doc. 1, ¶ 33.) This letter was apparently the first time Plaintiff officially notified Widener of his ADHD. (See Doc. 1, ¶¶ 32-33.) He also proposed to retake the portion of the section of the exam he failed, noting that approximately five of his peers (twenty percent of the class) also failed to pass

the retake exam, but that Widener allowed them to continue in the program. (Doc. 1, ¶¶ 32-33.) By letter dated November 19, 2010, Plaintiff appealed his termination from the Program. (Doc. 1, ¶ 34.) On November 22, 2010, the faculty met behind closed doors to reject Plaintiff's appeal. (Doc. 1, ¶ 37.)

On December 10, 2010, Plaintiff, through counsel, appealed again, asserting that his termination constituted illegal disability discrimination. (Doc. 1, ¶ 38.) Defendant responded that same day, notifying Plaintiff that the Academic Council would consider his appeal on December 16, 2010. (Doc. 1, ¶ 45.) Three days later, on December 13, 2010, Defendant demanded Plaintiff resubmit his appeal without the assistance of counsel. (Doc. 1, ¶ 45.) On December 14, 2010, Plaintiff responded by requesting the basis for his termination; he also demanded the right to counsel at his appeal meeting and for permission to question his accusers. (Doc. 1, ¶ 46.) On December 15, 2010, Defendant responded by rejecting all of Plaintiff's requests. (Doc. 1, ¶ 46.) On December 16, 2010, Plaintiff, by himself, attended a meeting with the Academic Council. (Doc. 1, ¶ 47.) By letter dated December 20, 2010, Defendant again rejected Plaintiff's appeal. (Doc. 1, ¶ 47.)

Plaintiff appealed his termination to the Academic Review Board, which met in secret on January 18, 2011 to discuss the appeal, which was again rejected. (Doc. 1, ¶¶ 47-48.) Plaintiff then filed a complaint with the U.S. Department of Education, Office of Civil Rights (the "OCR"). (Doc. 1, ¶ 49; Doc. 1-1.) By decision dated July 25, 2011, the OCR rejected Plaintiff's complaint. (Doc 1, ¶ 49; Doc. 1-1.)

On September 23, 2011, Plaintiff initiated the instant action. (Doc. 1.) The Complaint

alleges two counts: (1) Violation of Section 504 of the Rehabilitation Act of 1973; and (2) Breach of Contract.  (Doc. 1, ¶¶ 51-64.)

## II.    STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim.  See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-98 (3d Cir. 2000).  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original).  In Twombly, the Court made clear that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face." Id. at 570.  A "pleader is

required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).

In 2009, the United States Supreme Court revisited the requirements for surviving a 12(b)(6) motion to dismiss in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009). In Iqbal, the Court made clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [will] not suffice" to defeat a Rule 12(b)(6) motion to dismiss. 129 S. Ct. at 1949. "[O]nly a complaint that states a plausible claim for relief [will] survive[] a motion to dismiss." Id. at 1950.

In light of the decision in Iqbal, the Third Circuit set forth a two-part analysis to be applied by district courts when presented with a 12(b)(6) motion. First, the court must separate the legal elements and factual allegations of the claim, with the well-pleaded facts accepted as true but the legal conclusions disregarded. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." Id. at 211 (citation omitted). If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged, but has failed to show, that the pleader is entitled to relief. Id.

### III.   DISCUSSION

#### A.   Count One: Violation of Section 504 of the Rehabilitation Act of 1973

Plaintiff alleges that Defendant violated Section 504 of the Rehabilitation Act ("Section 504"). Section 504 provides:

> No otherwise qualified individual with a disability in the United States, as defined in [section 705(20) of this title], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).  To prove a violation of Section 504, a plaintiff must demonstrate that: (1) he is an individual with a disability; (2) he is "otherwise qualified" to receive the benefit in question; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance.  See Wagner v. Fair Acres Geriatric Ctr., 49 F. 3d 1002, 1009 (3d Cir. 1995).

Plaintiff indisputably meets the first and fourth prongs of the test: he has submitted that he suffers from ADHD, a recognized disability under Section 504,  see C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 62 (3d Cir. 2010), and Widener receives federal financial assistance.

Plaintiff also meets the second prong of the test because the Complaint, taking the facts as true as this Court must do for purposes of this Motion, states a claim that Plaintiff is "otherwise qualified" for enrollment in the Program.  For purposes of Section 504, "an otherwise qualified person is one who is able to meet all of the program's requirements in spite of his handicap." Southeastern Cmty. Coll., 442 U.S. 397, 406 (1979).  As spelled out in the Complaint, when Plaintiff was expelled in the fall of 2011, he was in good academic standing.  If his retake exam had been one point higher, no grounds would exist for expulsion.  Certain deductions on his exam—one point for "incorrect clause structure" and another point for using the word "but"—seem minor and subjective.  Although such deductions might well be within the faculty's professional discretion, five of Plaintiff's similarly situated, non-disabled peers—twenty percent

of the class—failed one or more sections of the retake exam but were not deemed unqualified for the Program. Thus, Plaintiff has sufficiently pled that he was "otherwise qualified" for the Program, i.e., able to meet all of the program's requirements in spite of his handicap—at least if he is judged according to the same standard with which Defendant judged his peers.

Plaintiff also meets the third prong as the facts, taken as true, suggest that he was denied the benefits of the Program solely by reason of his disability. This is evidenced by how Plaintiff was treated as compared to his similarly-situated, non-disabled peers. Again, rather than allow Plaintiff another retake exam—as Defendant did with Plaintiff's peers—Defendant expelled Plaintiff without a hearing. Unlike Plaintiff's peers, who received adequate notice of proceedings held to remedy their insufficient scores, Plaintiff was provided with only three days' notice to request a hearing to remain in the Program. For some unknown reason or reasons, notice was provided by an email address that Dr. Goldberg—Plaintiff's own faculty advisor—had never used to communicate with him before. When this email was automatically filtered to Plaintiff's "junk mail" file, no one followed up with him. Instead, Widener notified Plaintiff that he was expelled, citing his failure to request a hearing. Defendant further supported its decision to expel Plaintiff by referring to "strange behavior," and the like. Accepting these facts as true, and drawing all reasonable inferences in the light most favorable to the non-moving party, Plaintiff has sufficiently pled that he was discriminated against solely by reason of his disability. Of course, it is entirely possible that Defendant, through discovery, may establish different grounds for the treatment of which Plaintiff complains, but at this stage of the litigation, it has not.

Defendant's argument that Plaintiff cannot sustain a cause of action under Section 504 because he never officially notified Widener of his condition is off the mark.[2] (See Doc. 3.) Defendant would indeed be correct that official notification would be required if Plaintiff's claim were for failure to provide reasonable accommodations. See Shamonsky v. Saint Luke's Sch. of Nursing, et. al., 2008 U.S. Dist. LEXIS 20426, at *10-11 (E.D. Pa. March 17, 2008) (citing Leacock v. Temple Univ. Sch. of Med., 1998 U.S. Dist. LEXIS 18871, at * 10 (E.D. Pa. 1998); see also Nathanson v. Medical Coll. of Pa., 926 F. 2d 1368, 1381 (3d Cir. 1991). Almost by definition, "[f]or a school to be able to make reasonable accommodations for a student, it must have knowledge that such accommodations are required." Leacock, 1998 U.S. Dist. LEXIS 18871, at * 10. Plaintiff's claim, however, is not based on reasonable accommodations, but on disability discrimination; nothing in Section 504 requires a student with a disability to provide official notification of his condition in order to state a claim for disability discrimination.

The issue in this case—a disability discrimination case—is not whether Widener had official notification of Plaintiff's disability, but whether the faculty knew or had reason to know of Plaintiff's disability and discriminated against him solely on that basis. See Nathanson, 926 F.2d at 1381. The Complaint states that at least three[3] members of the faculty had actual knowledge of Plaintiff's disability when he was expelled. The Complaint further states that Dr.

---

[2] Defendant makes this argument by way of Plaintiff's November 10, 2010 letter, which states "you may not be aware, as I have been avoidant in disclosing this information, but I was diagnosed with ADHD." (Doc. 3 at 4-5.) This letter, however, demonstrates nothing more than Plaintiff's reluctance to reveal his condition. It does not, as Defendant suggests, establish that Plaintiff never gave notice, official or otherwise, to anyone at Widener.

[3] In the Complaint, Plaintiff submits that he notified "Dr. Gillespie, Dr. Goldberg and other Widener professors and administrators that he suffered from ADHD." (Doc. 1, ¶ 55.) Plaintiff's reference in his Brief (Doc. 4) to a third professor, Dr. Lazar, "clarified" the well-pleaded allegations in the Complaint. See Pegram v. Herdrich, 530 U.S. 211, 229, n. 10 (2000). Specifically, it clarified who some of the "other Widener professors and administrators" were.

Gillipse warned Plaintiff not to disclose his condition to the faculty because it would be regarded as a "sign of weakness and unsuitability for the program," suggesting that the Program suffered from a culture of discrimination.  Taken together, all of this plausibly suggests that Defendant had knowledge of Plaintiff's disability and discriminated against him solely on that basis.  Thus, Plaintiff states a claim for disability discrimination and the Motion to Dismiss Count I is denied.[4]

### B.     Count Two: Breach of Contract

Plaintiff's second claim is for breach of contract.  Pennsylvania defines the relationship between a privately funded college and a student as contractual in nature.  Reardon v. Allegheny Coll., 926 A.2d 477, 481 (Pa. Super. Ct. 2007).  Accordingly, this Court's role is to review administrative materials and student handbooks under ordinary principles of contract law as would be done in any other agreement between two private parties.  See Id.

Under Widener's Guidelines for the Third Year Qualifying Examination (the "Guidelines"), its policy is that "[i]f a student fails any section for a second time, that student *will* be brought before the faculty for review for continuation in the program.  At this time, other information, including any material that student wished [sic] to present, *will* be considered." (Doc. 4-3, at 5) (emphasis added).  The facts as alleged establish that Widener failed to comply with this provision of its Guidelines.

---

[4] Defendant's reliance on Shamonsky v. Saint Luke's Sch. of Nursing, 2008 U.S. Dist. LEXIS 20426, at *10-11 (E.D. Pa. March 17, 2008) for its lack-of-official-notice argument is also misplaced.  In that case, the court observed that "[w]here a student has failed to show that the school was aware of her disability at the time she was terminated, the student has failed to state a claim."  The court's statement of the law is correct, but the facts of that case are inapposite.  The only facts in Shamonsky to suggest that the faculty had knowledge of plaintiff's learning disability were "poor admissions test scores" and "a passing remark by a teacher."  Id. In this case, Plaintiff has greater facts—in both quantity and import—to make the claim of faculty knowledge plausible.

As a cannon of statutory interpretation—and as a matter of sound policy—the Court must resolve any ambiguities in a contract in favor of the non-drafting party. <u>Devcon Int'l Corp. v. Reliance Ins. Co.</u>, 609 F.3d 214, 218 (3d Cir. 2010). The non-drafting party here, of course, is Plaintiff. Under this Court's reading of the Guidelines, Widener was contractually required to bring Plaintiff before the faculty for review before turning to the harsh remedy of expulsion. Indeed, the Guidelines' language that the "student will be brought before the faculty *for review for continuation in the program*" implies that faculty review must take place before expulsion. (Doc. 4-3 at 5) (emphasis added). Instead of fulfilling this contractual duty, Widener expelled Plaintiff and denied him his right to a hearing, citing his failure to respond to an email sent from an unknown email address and filtered automatically to his "junk email" folder. Although Plaintiff was eventually provided with a hearing, it occurred only after several appeals and after expulsion. It would be unreasonable to read the contract as permitting a hearing under such unfavorable circumstances to be sufficient under the terms of the Guidelines. Thus, Plaintiff has stated a claim for breach of contract for Defendant's failure to provide him with a hearing commensurate with the contractual requirements of the Guidelines.

Moreover, Widener breached its contract with Plaintiff by failing to provide a remediation plan. As per Widener's Pys.D. Student Manual (the "Manual"):

> In those rare instances in which a student demonstrates over the course of the program difficulties that are persistent, severe, or both, the program may require that the student obtain additional information to enable the faculty to render an appropriate decision concerning the student . . . . Based on the information obtained, *a remediation plan will be developed*. (Doc. 4-2 at 12-13) (emphasis added).

In Plaintiff's case, no remediation plan was developed. This Court has already outlined the manner in which Plaintiff was expelled and need not revisit that series of events except to point out that it was not in accordance with the terms of the Manual. Accordingly, Plaintiff has stated a claim for breach of contract for Widener's failure to develop a remediation plan as contractually required by the Manual.[5]

In its Brief, Defendant argues that "'[w]here there is academic dismissal, as in the present case . . . courts are ill-equipped to review the largely subjective academic appraisals of the faculty.'" (Doc. 3 at 10) (quoting Leacock, 1998 U.S. Dist. LEXIS 18871, at *15 (citation omitted). While Defendant may indeed be correct about this statement of the law and the courts' role in cases of academic dismissals, this Court is not reviewing the academic appraisals of the faculty, but has reviewed the terms of the contract and finds that the facts as alleged state a claim for breach of contract. At this stage of the litigation, it is unnecessary for the Court to consider whether the faculty's decision was proper as Defendant suggests or whether, as Plaintiff alleges, was "'a substantial departure from accepted academic norms.'" (Doc. 4 at 14) (quoting Regents of the Univ. of Mich. v. Ewing, 474, U.S. 214, 225 (1978)). Plaintiff has stated a claim for breach of contract and Defendant's Motion to Dismiss Count II is denied.

---

[5] Plaintiff's allegation that Widener breached its contract by imposing interim sanctions on him without providing "oral or written" notice is flawed by an out-of-context reading of the Graduate Student Handbook. Although Plaintiff is correct that he would be required to be given notice if interim sanctions were imposed on him, they were not. Interim sanctions refer to sanctions imposed when "university officials judge a student to pose a threat to himself, herself, or the community, or where the student has been charged with a crime of a serious nature." (Doc. 5 at 30.) This is not the type of situation where interim sanctions would be appropriate and they were not imposed. Therefore, this breach of contract theory fails. In addition, this Court finds Plaintiff's argument that Widener breached its contract with him by failing to offer an additional paid practicum year to be incorrect. (Doc. 4 at 13.) Such an offer could be made by Widener only if Plaintiff had failed three or more sections of the Examination, which he did not. (Doc 4-3 at 4.)

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss the Complaint will be denied.

An appropriate order follows.