**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY NORTH,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **WIDENER UNIVERSITY,** | : | **NO. 11-6006** |
| **Defendant.** | : | |
| | : | |

**MEMORANDUM OPINION**

Tucker, C.J.                                                                          July 10, 2013

Presently before the Court is Plaintiff Jeffrey North's motion for summary judgment on his breach of contract claim against Defendant Widener University (Doc. 20), as well as Defendant's cross motion for summary judgment on all counts asserted by Plaintiff (Doc. 21). Upon consideration of the parties' motions with briefs and exhibits, this Court will deny both parties' motions with respect to Plaintiff's claim that Widener breached its contractual obligations when failing to provide Plaintiff with a pre-termination hearing.    Plaintiff's breach of contract claim with respect to all other matters, as well as Plaintiff's claim under Section 504 of the Rehabilitation Act, is dismissed in favor of Widener.

**I.      BACKGROUND**

This case arises from Plaintiff's expulsion from the Graduate Clinical Psychology Program at Widener University.    Plaintiff submits that he suffers from Attention Deficit Hyperactivity Disorder ("ADHD") and that his expulsion was a result of discrimination based on this condition.    The relevant facts giving rise to his expulsion are as follows.

Plaintiff's first involvement with the University was as an undergraduate intern employed at the University's Neuropsychology Assessment Center ("NAC").    During the time Plaintiff

1

worked for the NAC, he lived at the home of a close family friend, Dr. Robert Gillespie ("Dr. Gillespie"), who at the time was employed by the University as Associate Director of the NAC. On December 31, 2005, Plaintiff submitted an Application for Admission to the University's Graduate Clinical Psychology Program (the "Program"), and was admitted on March 8, 2006. Once enrolled in the Program, Plaintiff was assigned Dr. Kenneth Goldberg ("Dr. Goldberg") to serve as his faculty advisor.   As a graduate student in the Program, Plaintiff was subjected to the University's Graduate Student Handbook, Manual for Clinical Psychology Students (the "Manual"), and the Guidelines for the Third-Year Qualifying Examination Doctor of Psychology Degree (the "Guidelines").

**Annual Program Review/Academic Probation/Leave of Absence**

Pursuant to the Manual, students are formally reviewed by the core-faculty during their first and third year in the Program.   The Manual also provides for student reviews during other years in the Program.   In accordance with the Manual, the Program faculty reviewed Plaintiff's progress as a first-year student on February 5, 2007.   Following the review, Plaintiff received a letter from the Program Director Virginia Brabender, Ph.D. ("Dr. Brabender") advising him that he was on academic probation as his grade point average fell below the average needed to maintain good standing in the Program.   Dr. Brabender also recommended that Plaintiff meet with Dr. Goldberg regularly and work on a plan to improve his academic standing.

On November 19, 2007, the faculty reviewed Plaintiff's progress as a second-year student.   While Plaintiff was no longer on academic probation, the faculty found that he continued to struggle academically and alerted him to "significant concerns regarding his performance in the program."   See Def.'s Ex. K, December 6, 2007 correspondence to Plaintiff

2

from Dr. Brabender.    Due to those significant concerns, Dr. Brabender required Plaintiff to meet with both herself and Dr. Goldberg upon his return for the spring semester.

Upon his return for the spring semester, Plaintiff was assigned to perform a practicum with NHS of Philadelphia.    Due to a number of issues including failure to submit paperwork in a timely fashion, problems maintaining a caseload, and issues concerning attendance and professionalism, Plaintiff was placed on a thirty (30) day probation.    Plaintiff was also given a written probation plan detailing four (4) specific goals and advised that his goals would be monitored and discussed with the University.

In March, 2008, Plaintiff met with Dr. Brabender and Dr. Goldberg to discuss his status in the Program. After discussing his options, Plaintiff opted to take a one (1) year leave of absence from the University.    Plaintiff again met with Dr. Goldberg on April 16, 2008, at which time his grades, practicum, and year of absence were discussed.

Following his leave of absence, Plaintiff returned to the University in the fall of 2009. On November 17, 2009, Plaintiff met with Dr. Goldberg for an advisee meeting.    At this meeting, Dr. Goldberg discussed with Plaintiff his probationary status, grades, and performance issues that had been raised by his current practicum supervisor.    Plaintiff and Dr. Goldberg agreed that Plaintiff would contact his practicum supervisor directly and continue to work in class to improve his grades.    In response, Plaintiff contacted his practicum supervisor and reported back to Elizabeth Gibbings, the University's practicum placement coordinator.

On March 8, 2010, the faculty reviewed Plaintiff's status in the Program.    It was determined by the faculty that Plaintiff would again be placed on probation due to continued behavioral concerns at his practicum site and continued difficulties with professional

3

responsibilities.    Plaintiff was advised, in writing, that the faculty had concerns with his professional development and that his status in the Program would be again reviewed in May 2010 to determine his eligibility to sit for the Third-Year Qualifying Examination (the "comprehensive examination").

On March 18, 2010, Plaintiff met with Dr. Brabender and Dr. Goldberg to discuss his probationary status.    During that meeting, there was a discussion with Plaintiff about steps that should be taken so that his probation could be lifted, such as meeting with professors, being on time for class, and not missing time from his practicum.    Following the meeting, Plaintiff again met with Dr. Goldberg to review his progress and the steps he had taken to address the faculty concerns, as well as the upcoming faculty meeting.

On May 2, 2010, Plaintiff wrote to Dr. Goldberg outlining the goals that he was asked to work on and the steps he had taken to address all of the faculty concerns.    On May 3, 2010, the faculty reviewed the evidence presented by Plaintiff and their observations of his conduct since being placed on probation.    The faculty voted to lift his behavioral probationary status and placed him in good standing so that he could sit for the comprehensive examination.

**Failures of the Comprehensive Examination**

In the spring of 2010, Plaintiff sat for the comprehensive examination for the first time. While he passed three (3) sections of the examination, he failed two (2) others – Research Methods and Assessment.    In accordance with the Guidelines, Plaintiff was afforded a re-take of the sections that he did not pass.    The Guidelines recommend that students meet with the faculty member who graded the failed question(s) to obtain feedback.    Throughout the fall of 2010, Plaintiff met with Dr. Hal Shorey ("Dr. Shorey"), who was also his dissertation chair, to

discuss his failed answer as well as to prepare for the upcoming retake examination.

Plaintiff retook the comprehensive examination in late October, 2010.   On November 2, 2010, Plaintiff was advised that while he passed the Assessment portion of the retake examination, he had again failed the Research Methods.   In accordance with the Guidelines, any student who fails any section of the examination for a second time is subject to faculty review for continuation in the Program.

**Faculty Review of Program Status Following Second Failure of Comprehensive Examination**

On November 2, 2010, Dr. Goldberg emailed Plaintiff at his University email account the following:

> Dean Wilhite has informed me to ask for the following.   He requires a letter to be sent by Friday, November 5, 2010.   This letter should request continuation in the program and include a plan for remediating the continuing area of weakness and any other information that you believe is relevant to the faculty's consideration.   I will need the letter in order to present your situation to the faculty on Monday, November 8, 2010.

See Pl.'s Ex. H, November 2, 2010 correspondence to Plaintiff from Dr. Goldberg.   Dr. Goldberg also emailed Plaintiff at his personal email account, alerting Plaintiff to the email he had just sent to Plaintiff's University account.   See Def.'s Ex. BB.   Plaintiff failed to submit any request for continuation in the Program in advance of the November 8, 2010 faculty meeting.   Plaintiff claims that he did not receive Dr. Goldberg's email until the evening of November 8, 2010 because Dr. Goldberg's email was in his spam folder.   According to Plaintiff, Dr. Goldberg's email was sent from an unknown email address, rather than his official University account, which caused his computer system to automatically designate the email as spam.   Widener refutes Plaintiff's accusations, arguing that the email address from which Dr. Goldberg's message was sent is in fact his official email address and that Plaintiff communicated

with Dr. Goldberg at this email address on multiple occasions dating back to 2008.

While Plaintiff did not submit information to the faculty in time for the November 8, 2010 faculty meeting, Dean Stephen Wilhite ("Dean Wilhite") presented a chart detailing a summary of Plaintiff's history in the Program for the faculty's consideration.   Plaintiff, along with the other students subject to review for continuation in the Program, was not invited to the meeting and did not attend.   Following a discussion, there was a vote by the faculty to terminate Plaintiff from the Program.   Among the group of students subject to review, Plaintiff was the only student that was dismissed.[1]   Widener's cited reasons for Plaintiff's dismissal were his failing score on the comprehensive examination, his failure to submit a formal request for continuation in the Program, and his previous history of problematic behavior.

**Appeals of Faculty Decision to Dismiss Plaintiff from the Program**

By letter dated November 10, 2010, Plaintiff appealed his termination, requesting that the faculty reinstate him into the Program.   In a follow-up letter dated November 19, 2010, Plaintiff challenged the faculty's decision.   Plaintiff presented his appeal in person to the faculty on November 22, 2010.   The meeting minutes read, in pertinent part:

> Prior to the faculty meeting, documentation provided by Mr. North supporting his appeal of his termination from the program was made available to the faculty . . . Mr. North was invited to join the meeting. Mr. North's attorney accompanied him . . . Mr. North proceeded to read a statement he prepared on his behalf and was then given to the [sic] opportunity to answer questions . . . Dr. Wilhite thanked him for coming and informed him that he would receive an email communication the next day informing him of the action taken by the faculty.   Faculty discussion ensued as to whether to uphold the decision to terminate.

> Faculty agreed to table the decision until the next faculty meeting because

---

1  The parties dispute the number of students subject to review for continuation in the Program at the November 8, 2010 meeting.   Plaintiff claims that there were seven (7) students subject to review, while Widener contends that there were only four (4) students.   Nonetheless, the Court finds this dispute to be immaterial.

of the need of some faculty present to attend a dissertation defense and to allow Dr. Wilhite time to consult with university legal counsel. Dr. Wilhite indicated that Mr. North would be informed that he can continue his clinical placement and continue to attend class until a decision is reached on his appeal at the December 6 meeting of the faculty. Dr. Elwork asked the faculty to keep in mind that it was not just the negative outcome of the comprehensive exam retakes that lead [sic] to the decision to terminate but included also consideration of Mr. North's entire history in the program.

See Pl.'s Ex. K.

On December 6, 2010, the faculty met to consider Plaintiff's appeal. The faculty denied Plaintiff's appeal. In accordance with the Manual, Plaintiff was given the opportunity to appeal the faculty's decision to the Academic Council of the School of Human Service Professions ("Academic Counsel"). On December 16, 2010, the Academic Counsel heard Plaintiff's appeal, at which time he appeared in person. Plaintiff was informed, by letter dated December 20, 2010, that the Academic Counsel voted to uphold the decision of the faculty in dismissing him from the Program.

On December 22, 2010, Plaintiff appealed his termination to the Academic Review Board, and was afforded a second opportunity to present his appeal in person. On January 18, 2011, the Academic Review Board heard Plaintiff's appeal. Plaintiff's final appeal was denied and his dismissal was upheld.

**North Notifies the University of his ADHD**

In asserting a claim under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, et seq., Plaintiff alleges that Widener discriminated against him due to his learning disability. According to Plaintiff, multiple members of the University were well aware of his struggles with ADHD prior to his termination in November,

7

2010.   Plaintiff alleges that Dr. Gillespie, the close family friend and University professor he lived with while interning at the NAC, knew about his condition for many years and told him not to disclose it to the faculty because it would be regarded as a sign of weakness and unsuitability for the program.   Plaintiff further alleges that he shared his condition with several professors in the Program, including Drs. Mary Lazar (Dr. Lazar), Wendy Sarkisian (Dr. Sarkisian), Goldberg, and Shorey.[2]

With respect to Drs. Lazar and Sarkisian, Plaintiff alleges that, while interning at the NAC, he brought his psychiatric and medical files from high school to the office and asked Dr. Lazar, while Dr. Sarkisian was present, if she would like to review his diagnosis of ADHD. Plaintiff claims that Dr. Lazar looked uncomfortable and said nothing, but Dr. Sarkisian explained to Plaintiff that Dr. Lazar could not review such files and that Plaintiff should keep his ADHD diagnosis private.

With respect to Dr. Goldberg, Plaintiff alleges that he discussed his ADHD with Dr. Goldberg on two occasions during the fall of 2009.   According to Plaintiff, the first conversation took place during a scheduled advisory meeting for a group of students.   Plaintiff claims that Dr. Goldberg asked the students to share with the group how their semester was going and, in response, Plaintiff informed the group that he had just returned from academic probation.   Plaintiff alleges that after the meeting, Dr. Goldberg pulled him aside and told him to never discuss his struggles with his classmates because he could develop a reputation as "damaged goods."   Plaintiff contends that he took Dr. Goldberg's comments to mean that he should not disclose his ADHD.   The second conversation allegedly took place during midterms

---

[2] Plaintiff interned with Drs. Lazar and Sarkisian are work at the University's NAC during the summer of 2006. See Def.'s Ex. VV, Dr. Lazar's Dep.

in the fall of 2009.    Plaintiff claims that he informed Dr. Goldberg of his struggles and strides

with ADHD in high school and college.    Plaintiff specifically alleges that he explained to Dr.

Goldberg that while he thought he did not need take this his medication in college the pressures

of being in the Program had made his condition a struggle again.    According to Plaintiff, Dr.

Goldberg told him that it was inappropriate for Plaintiff to discuss the matter at that time and that

Plaintiff's behavioral problems were causing him to develop a bad reputation. Plaintiff contends

that he took Dr. Goldberg's comments as yet another warning against disclosing his ADHD.

      With respect to Dr. Shorey, Plaintiff claims that he informed Dr. Shorey of his condition

in the fall of 2010 after taking his comprehensive exams and that that Dr. Shorey did not

respond.

      In addition to Plaintiff's allegations regarding faculty members knowledge of his

condition, Plaintiff seems to assert that the University should have been aware of his condition

based on his behavioral problems throughout the Program, as well as his essay submitted with

his Admissions Application, which reads in pertinent part:

> My desire to acquire a doctorate and pursue work in psychological assessment has
> developed from the experiences I have had with psychology in my life.    As early
> as high school, I became familiar with psychology practice as I struggled with and
> worked to overcome the problems I faced during adolescence. As an outgrowth of
> family and individual problems, my parents encouraged me to attend a boarding
> school to complete high school.    My first exposure to psychology was a negative
> one; I was rapidly cycled through medications and programs to help "fix" my
> admittedly nonconforming behaviors.

See Def.'s Ex. C, Plaintiff's Application for Admission.

      Contrary to Plaintiff's assertions, Widener contends that it did not become aware

of Plaintiff's alleged disability until Plaintiff submitted his November 10, 2010 appeal

letter, in which he stated: "You may not be aware, as I have been avoidant in disclosing

9

this information, but I was diagnosed with ADHD."   See Def.'s Ex. HH, Plaintiff's

November 10, 2010 Letter.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the movant establishes that "there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(c); <u>Levy v. Sterling Holding Co., LLC</u>, 544 F.3d 493, 501 (3d Cir. 2008).   A

factual dispute between the parties will not defeat a motion for summary judgment unless it is

both genuine and material. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986);

<u>Dee v. Borough of Dunmore</u>, 549 F.3d 225, 229 (3d Cir. 2008).   A factual dispute is genuine if

a reasonable jury could return a verdict for the non-movant, and it is material if, under the

substantive law, it would affect the outcome of the suit.   <u>See</u> <u>Fakete v. Aetna, Inc</u>., 308 F.3d

335, 337 (3d Cir. 2002).   The moving party must show that if the evidentiary material of record

were reduced to admissible evidence in court, it would be insufficient to permit the non-moving

party to carry its burden of proof.   <u>See</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts."   <u>Scott v. Harris</u>,

550 U.S. 372, 380 (2007) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S.

574, 586 (1986)).   Under Rule 56(e), the opponent must set forth specific facts showing a

genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.

<u>See</u> <u>Martin v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007). At the summary judgment stage, the

court's function is not to weigh the evidence and determine the truth of the matter, but rather to

determine whether there is a genuine issue for trial.   <u>See</u> <u>Jiminez v. All American Rathskeller,</u>

<u>Inc.</u>, 503 F.3d 247, 253 (3d Cir. 2007).   In doing so, the court must construe the facts and inferences in the light most favorable to the non-movant.   See <u>Matsushita</u>, 475 U.S. at 587; <u>Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.</u>, 258 F.3d 132, 140 (3d Cir. 2001).

## III.   <u>DISCUSSION</u>

### A.   **Breach of contract**

Both parties move for summary judgment on Plaintiff's breach of contract claim. Plaintiff's motion for summary judgment on his contract claim is anchored on Widener's alleged failure to comply with its obligations established in the University's policy manuals. Plaintiff specifically asserts that Widener breached its contractual obligations when (1) failing to permit Plaintiff to physically appear before the Faculty Board for a pre-termination hearing; (2) failing to consider Plaintiff's entire history and (3) failing to provide Plaintiff with a written remediation plan before terminating him from the Program.   Widener avers that summary judgment should be granted in its favor because the University correctly dismissed Plaintiff from the Program and complied with all parameters established in its various publications.   According to Widener, the University was not required to provide Plaintiff with a pre-termination hearing, Plaintiff's entire history in the Program was reviewed prior to his termination, and the Program provided Plaintiff with several remediation plans during his tenure in the Program.

### 1.  **Pre-Termination Hearing**

As a student in the Psy.D. Program, Plaintiff is afforded the protections of the Guidelines. The Guidelines provide:

> If a student fails any section for a second time, that student will be brought before the faculty for review for continuation in the program. At this time, other information, including any material the student wished to present, will be considered.

See Guidelines, at p. 5.   Plaintiff contends that the Guidelines' reference to a student being

"brought before the faculty" refers to the student himself appearing before the faculty prior to

being terminated.   Admittedly, the Court agreed with Plaintiff's interpretation when denying

Widener's motion to dismiss Plaintiff's complaint.   This Court specifically stated:

> Under this Court's reading of the Guidelines, Widener was contractually
> required to bring Plaintiff before the faculty for review before turning to
> the harsh remedy of expulsion.   Indeed, the Guidelines' language that the
> "student will be brought before the faculty for review for continuation in
> the program" implies that faculty review must take place before the
> expulsion.
>
> Instead of fulfilling this contractual duty, Widener expelled Plaintiff and
> denied him his rights to a hearing, citing his failure to respond to an email
> sent from an unknown email address and filtered automatically to his
> "junk email" folder.   Although Plaintiff was eventually provided with a
> hearing, it occurred only after several appeals and after expulsion.   It
> would be unreasonable to read the contract as permitting a hearing under
> such unfavorable circumstances to be sufficient under the terms of the
> Guidelines.

See Ct. Order dated April 4, 2012.   However, having now been presented with record evidence

that reasonably supports Widener's alternative construction of the disputed Guideline language,

the Court finds that a latent ambiguity exists and, accordingly, reserves for the jury the issue of

which competing construction is the correct one.

**Pennsylvania Law on Contract Interpretation**

The Third Circuit has acknowledged, "Pennsylvania law on contract interpretation and

ambiguity is somewhat complicated [.]"   Bohler-Uddeholm America, Inc. v. Ellwood Group,

Inc., 247 F.3d 79, 92 (3d Cir. 2001).   Notwithstanding this complexity, courts agree that "[t[he

fundamental rule in contract interpretation is to ascertain the intent of the contracting parties,"

Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 468 (Pa. 2006), and

"Pennsylvania contract law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself," Bohler-Uddeholm, 247 F.3d at 92. Therefore, a contract that is unambiguous on its face must be interpreted by its content alone, "unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation." Id. at 96.

"[A] contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3D 604, 614 (3d Cir. 1995). To determine whether a latent ambiguity exists in a contract, the court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Bohler-Uddeholm, 247 F.3d at 93 (citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)). The evidence relied upon to support a claim of latent ambiguity must be based on a "contractual hook." That is, "the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face." Id. "Furthermore, the alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable; courts must resist twisting the language of the contract beyond recognition." Id.

Whether evidence of extrinsic circumstances is sufficient to create a latent ambiguity in a contract is a matter of law for the court. Once the court determines that a latent ambiguity exists the question of what the parties intended by the language used in the contract – taking into consideration the extrinsic facts and circumstances – is an issue to be submitted to the jury. Id.

at 94 (citing <u>Mellon Bank,</u> 619 F.2d at 1011, 1013-14).

**<u>The Parties' Interpretation of the Guidelines</u>**

As stated above, Plaintiff argues that the Guidelines' reference to a student being "brought before the faculty" unambiguously refers to the student himself appearing before the faculty prior to being terminated.   In contrast, Widener asserts that the disputed language in the Guidelines simply refers to the "student's file" being brought before the faculty prior to termination, and in no way requires that the University provide students with a pre-termination hearing.   To support its alternative construction, Widener points to the language of the Guidelines, as well as other University publications, such as the Graduate Student Handbook (the "Handbook") and the Manual for Clinical Psychology Students (the "Manual").   This use of other University publications comports with Pennsylvania law, which provides that "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other."   <u>Huegel v. Mifflin Construction Company, Inc.,</u> 796 A.2d 350, 354-55 (Pa. Super. 2002).[3]

Widener first points to the Guidelines, which provides that a student will be "brought before the faculty for continuation in the program. At this time, other information, including any material the student *wished to present*, will be considered." (emphasis added)   According to Widener, placing the phrase "wished to present" in past tense indicates that the faculty would review information previously provided by the student, which is reflected by the faculty's request that the student subject to review submit information to the faulty prior to the faculty meeting.   This review process was established by several members of the faculty.   <u>See</u> Dr.

---

[3] Under Pennsylvania law, "the contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution."   <u>See</u> Swartley v. Hoffner, 1999 PA Super 168 (Pa. Super. Ct. 1999).

Wilhite Dep. at p.43:7-12; Dr. Brabender Dep. at p. 14-16; <u>see also</u> Def.'s Ex. BB, email sent from Kenneth Goldberg to Jeffrey North on November 2, 2010 (requesting that Plaintiff submit a letter requesting continuation in the program so that Dr. Goldberg could "present [his] situation to the faculty on Monday, November 8, 2010.")

Second, Widener points to the "Grievance Appeal Procedures" in the Manual, suggesting that this particular section provides further clarification for ascertaining the University's intent. The Manual specifically provides that "[d]ecisions regarding termination from the program are made by the core faculty" and, "[students] have the right to appeal any decision made by a faculty member or group of faculty members using procedures outlined in the University Student Handbook." <u>See</u> Manual at p.14. According to Widener, there is no mention of any student involvement or participation in such determination and the process by which a student is afforded a hearing is in the context of a termination appeal, not a pre-termination hearing. Widener also points to the Graduate Student Handbook, arguing that its silence to any process for a pre-termination hearing of an academic dismissal, despite being replete with sections governing hearing rights and the hearing process, further supports its position that the University is not contractually obligated to provide students, such as Plaintiff, with a pre-termination hearing wherein the student physically appears before the core faculty.

Having fully considered Widener's arguments, the Court finds that its alternative construction of the disputed contract language is reasonable when considered in the context of the other University publications, as well as the faculty members' deposition testimony. More importantly, the extrinsic evidence that Widener relies upon sufficiently serves as a "contractual hook," as it directly relates to the University's linguistic reference rather than its expectations.

Because Widener's reading of the phrase cast doubt on Plaintiff's interpretation, a latent ambiguity exists and, necessarily, a decision as to which of the competing interpretations of the contract is the correct one shall be reserved for the jury.

**2.  Faculty Review of Plaintiff's Continuation in the Program**

Next, Plaintiff contends that Widener breached its written contract when failing to provide advance notice of the November 8, 2010 meeting, wherein the faculty reviewed his continuation in the Program.    Specifically, Plaintiff alleges that he did not discover Dr. Goldberg's email, requesting that Plaintiff submit a letter for continuation in the program to be presented at the November 8, 2010 meeting, until the evening of November 8, 2010 because it was sent from an unknown email address and, consequently, relegated to his spam folder. Plaintiff further contends that the University breached its contractual obligation when the faculty failed to consider his entire file before making the decision to dismiss him from the Program. Widener refutes Plaintiff's claims, arguing that the Court should grant summary judgment in its favor since Plaintiff was well aware of his jeopardized status and terminated after full review of his academic and behavioral history in the Program.    Based on the record evidence, the Court agrees with Widener.

First, aside from Plaintiff's affidavit, there is nothing in the record to support his allegation that he did not receive advance notice of the November 8, 2010 meeting due to Dr. Goldberg's email being sent to a spam folder.    See Betts v. New Castle Youth Dev. Ctr., 621 F3d 249, 252 (3d Cir 2010) ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment).    Moreover, the record evidence directly contradicts Plaintiff's claim that Dr. Goldberg's email was sent from an "unknown"

16

email address.    As explained by Peter Shoudy, Chief Information Officer of the University, the

email address from which Dr. Goldberg's email was sent to Plaintiff ("Kbg001@widener.edu")

is exactly equivalent to "Kenneth.b.goldberg@widener.edu," the email address Plaintiff believed

to be linked to Dr. Goldberg's official account.    See Shoudy Dep, at p.7:21-25.    Additionally,

University logs demonstrate that Plaintiff has communicated with Dr. Goldberg using the

"kb001" address on multiple occasions dating back to 2008.    See Def.'s Ex. EE; see also

Shoudy Dep.    Based on the record evidence, the Court finds it very difficult to consider

Plaintiff's accusations.[4]

     To the extent Plaintiff's contention is that his dismissal came to him as a complete

surprise, it is also important to note that the record clearly demonstrates that Plaintiff was well

aware of the fact that his continuation in the Program was under review since he failed the

comprehensive examination for a second time.    The Guidelines specifically provide for review

of a student in the Program in the event of a second failure, see Guidelines, at p. 5, and this

process is orally communicated to students in the Program, see Def.'s Ex. M, Brabender Dep. at

11-15.    Moreover, when Dr. Wilhite informed Plaintiff that he did not pass all sections of the

comprehensive exam re-take, he further advised Plaintiff that he was "not eligible to elevate to

official candidacy for the doctoral of psychology degree" and "the conditions for [his] continuing

in the program [would] be reviewed by the faculty in the coming weeks."    See Def.s Ex. Z.

     Furthermore, Plaintiff fails to demonstrate how the faculty's review of his history in the

Program was "short" and "one-sided."    Before making a decision to terminate Plaintiff from the

Program, the faculty reviewed a 6-page summary of Plaintiff's academic and behavioral history

---

[4]    Plaintiff also fails to acknowledge that, in addition to Dr. Goldberg's email to his University account, Dr.
Goldberg also sent an email to Plaintiff's personal account, requesting that Plaintiff check his University account for
the email regarding the faculty meeting.

dating back to his first semester in the Program.    The mere fact that the faculty chose not to

review the actual file documents, but rather a comprehensive summary of the file, does not, in

and of itself, create a breach, especially where Plaintiff has not alleged that the summary

excluded pertinent information.    Plaintiff does allege that the faculty's review did not include

his recommendation letters for admittance into the Program.    However, the Court finds it

difficult to ascertain how these particular letters have any bearing on Plaintiff's "overall

adjustment to graduate school, [his] classroom behavior, [his] use of advisement and supervision,

and [his] performance in the field placement," see Manual, Section F. at p. 10, and Plaintiff fails

to offer any explanation.    Accordingly, summary judgment with respect to this issue will be

granted in favor of the defendant.

### 3.  Formal Remediation Plan

The final basis for Plaintiff's breach of contract claim is Widener's alleged failure to

provide Plaintiff with a written remediation plan to help him pass the comprehensive

examination.    Plaintiff asserts that this contractual obligation is established in the Manual, which

states:

> In those rare instances in which a student demonstrates over the
> course of the program difficulties that are persistent, severe, or
> both, the program may require that the student obtain additional
> information to enable faculty to render an appropriate decision
> concerning the student . . . based on the information obtained, a
> remediation plan will be developed.

Widener contends that, contrary to Plaintiff's claim, the Manual does not require the

University to provide a written remediation plan in response to a student's failure of the

comprehensive examination and that the faculty adequately addressed Plaintiff's difficulties

when providing him with multiple remediation plans over the course of his tenure in the

Program.    Again, the Court agrees with Widener.

The Manual specifically provides that where a student demonstrates severe or persistent difficulties the program "may" require that the student obtain additional information for the program so that a remediation plan can be developed.    Plaintiff's claim that the Manual mandates the development of a remediation plan directly contradicts the insertion of the permissive term "may."    As Widener correctly points out, this particular clause is "worded very loosely providing for suggested courses of action depending upon a particular student's needs." (Def's Br. at p. 17)    Hence, it was at Widener's discretion whether to develop a remediation plan for Plaintiff upon failing the exam for a second time, and Widener's decision to not provide Plaintiff with one prior to terminating him does not warrant a breach of contract.    Plaintiff's mere displeasure with how Widener used its discretion is insufficient to establish a breach of contract.    Accordingly, summary judgment with respect to this issue will be granted in Widener's favor.

**B.    Section 504 of the Rehabilitation Act of 1973**

Widener moves for summary judgment on Plaintiff's claim under Section 504 of the Rehabilitation Act, arguing that it had no knowledge of Plaintiff's alleged disability.    The purpose of Section 504 is to prohibit discrimination on the basis of a disability in schools that receive federal funding.    29 U.S.C. § 794 (a).    In order to establish a violation of Section 504, the plaintiff must prove that (1) he is disabled; (2) he is otherwise qualified; (3) the school received federal financial assistance; and (4) he was excluded from participation in, denied benefits of, or subject to discrimination at the school.    Ridgewood Board of Education v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999).    Additionally, the plaintiff must demonstrate

19

that the school knew or should have known of the plaintiff's disability, but the plaintiff need not prove that the defendant's discrimination was intentional.   Id.

The only element that the parties appear to contest is whether Widener knew or should have known of Plaintiff's disability.   Plaintiff claims that he told several Widener employees about his ADHD and that, although he was otherwise qualified to remain in the Program, Widener never offered him a written remediation plan prior to his termination because of his ADHD. Widener denies Plaintiff's allegations, arguing that it was in no position to discriminate against Plaintiff on the basis of his alleged disability because Plaintiff never mentioned, disclosed, or alluded to having ADHD until after his dismissal from the Program.

Based on the record evidence, Plaintiff fails to offer sufficient evidence to create an issue of fact about whether Widener knew or could be reasonably expected to know that he suffered from ADHD.   First, while Plaintiff offers his affidavit and deposition testimony setting forth numerous occasions in which he allegedly disclosed his ADHD to Widener representatives, he fails to produce any evidence in support of these allegations.   Certainly, the Court is cognizant of the fact that in deciding a motion for summary judgment "it is not the role of the trial judge to weigh the evidence and determine the truth of the matter," but neither may a plaintiff "manufacture an issue of disputed fact by relying upon mere allegations, general denials, or [] vague statements." Stiles v. Synchronoss Techs., Inc., No. 07-1923, 2008 U.S. Dist. LEXIS 61565, at *3 (E.D. Pa. Aug. 12, 2008) (internal quotations and citations omitted).   Simply put, Plaintiff cannot rely on his own self-serving statements to survive a motion for summary judgment.   Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 ("The mere existence of a scintilla of

20

evidence in support of the [plaintiff's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiffs]").

Second, aside from Plaintiff's affidavit and deposition testimony, all of the record evidence suggests that Widener was not made aware of Plaintiff's disability until *after* his dismissal.   Not only does every faculty member to whom Plaintiff claims his ADHD was disclosed to deny any such knowledge or disclosure,[5] but even Plaintiff contradicts his own deposition testimony when he admits to the Program faculty that he had kept his condition private.   In his November 10, 2010 appeal letter submitted to the faculty, Plaintiff states: "You may not be aware, as I have been avoidant in disclosing this information, but I was diagnosed with ADHD."   See Def.'s Ex. HH.   As noted by Widener, "it is clear from North's own words that he avoided the disclosure of his ADHD to the University, and as such, the University cannot be found liable for discriminating against a disability in which it was not aware."   Def.'s Br., at p. 29.   Further, the Rehabilitation Act does not require Widener to reconsider its decision to dismiss Plaintiff simply because Plaintiff subsequently informs the University of his condition. See Leacock v. Temple Univ. Sch. of Med., 1998 U.S. Dist. LEXIS 18871, at *10 (E.D. Pa. Nov. 25, 1998).

Third, the Court does not find that Widener could have reasonably known of Plaintiff's alleged disability based solely on his behavioral problems and admission essay.   Because ADHD is a disability that is not visibly obvious and largely characterized by difficulties that even non-disabled persons may suffer from, the Court finds it difficult to conclude that Plaintiff's issues concerning professionalism, timeliness, and class attendance should have put

---

[5]  By affidavit or deposition, all the faculty members allegedly aware of Plaintiff's ADHD denied any such knowledge.   See Def.'s Ex. B (Dr. Gillespie's Aff.); Def.'s Ex. VV (Dr. Lazar's Dep.); Def.'s Ex. UU (Dr. Goldberg's Dep.); Def.'s Ex. V (Dr. Shorey's Dep.).

Widener on notice of his struggles with ADHD. The same rationale also goes for Plaintiff's admission essay where Plaintiff states that he was ""rapidly cycled through medications and programs to help 'fix' [his] admittedly non-conforming behavior."    While the Court does not ignore the fact this statement may reasonably allude to Plaintiff having an emotional or behavioral problem, this statement alone is not so clear as to reasonably expect Widener to know that Plaintiff suffered from an actual disability, such as ADHD, especially where Plaintiff admits to purposely avoiding disclosure of his condition during his matriculation in the Program.

Last, Plaintiff argues that Widener's allegedly favorable treatment of non-disabled students show that the faculty discriminated against him because of his disability.    As noted above, the University cannot be found to have discriminated against a disability in which it was not aware.    Moreover, the mere fact that non-disabled students were permitted to remain in the Program and Plaintiff was not is not dispositive, especially where the record suggests that these students may not have been similarly-situated to Plaintiff.    Nonetheless, having determined that Widener did not know or could not have been reasonably expected to know that Plaintiff suffered from ADHD, the Court finds this issue to be moot.    As such, summary judgment with respect to Plaintiff's claim under the Rehabilitation Act is granted in Widener's favor.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, both parties' motions are denied with respect to Plaintiff's claim that Widener breached its contractual obligations when failing to provide Plaintiff with a pre-termination hearing and Widener's motion for summary judgment is granted with respect to all other claims.    An appropriate order follows.